Lauren M. Rule (OSB # 015174), *pro hac vice*
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

Cynthia C. Tuell (AZSB # 025301)
WESTERN WATERSHEDS PROJECT
738 N. 5th Ave., Suite 206
Tucson, AZ 85705
(520) 272-2454
cyndi@westernwatersheds.org

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Western Watersheds Project and Grand Canyon Chapter of the Sierra Club; | ) ) ) Case No.: |
| Plaintiffs, | ) ) **COMPLAINT** |
| vs. | ) ) **(Declaratory and Injunctive Relief)** |
| U.S. Bureau of Land Management; | ) ) |
| Defendant. | ) ) |

## INTRODUCTION

1.    Plaintiffs Western Watersheds Project and Grand Canyon Chapter of the Sierra Club (hereafter "WWP") challenge the revised livestock grazing analysis completed by Defendant Bureau of Land Management ("BLM") for the agency's Sonoran Desert National Monument Resource Management Plan ("RMP").  BLM revised its grazing analysis after this Court ruled the prior analysis completed in 2012 was seriously flawed and unlawful under the National Environmental Policy Act.  *W. Watersheds Proj. v. BLM*, 2015 WL 846548, No. CV-13-01028-PHX-PGR (D. Ariz. Feb. 26, 2015); *W. Watersheds Proj. v. BLM*, 181 F. Supp. 3d 673 (D. Ariz. 2016).  Rather

than addressing the problems of the prior analysis, BLM conducted a new analysis that is equally flawed and allows for even more future livestock grazing that will degrade the biological and cultural resources on the Monument, in violation of the proclamation that established the Sonoran Desert National Monument.

2.     The Sonoran Desert is the most biologically diverse desert in North America.  President Clinton established the 496,337 acre Sonoran Desert National Monument in January 2001 to protect the biodiversity of plants and animals and their habitats, as well as the numerous historic and cultural sites, found in this desert setting. According to the proclamation that established the Monument, this newly protected area in the heart of Arizona has "an extraordinary array of biological, scientific, and historic resources" that provide for a "spectacular diversity of plant and animal species," including imperiled species such as desert bighorn sheep, Sonoran pronghorn, Sonoran desert tortoise, and many other birds, reptiles, and plants.

3.     Recognizing the harmful impacts that livestock grazing was having on this ecosystem, the proclamation closed all grazing allotments in the southern portion of the Monument, and allowed grazing to continue on the northern portion of the Monument *only* if BLM determined that grazing is compatible with the "paramount purpose of protecting the objects identified in this proclamation."  It also required BLM to prepare a management plan that addresses the actions "necessary to protect the objects identified in the proclamation."

4.     Shortly after designation of the Monument, rigorous scientific studies found that livestock were degrading soils, reducing plant diversity, increasing weeds and non-native plants, and damaging wildlife habitat on the Monument.  Yet, BLM determined in the previously-challenged grazing analysis for the Monument RMP that livestock grazing was compatible with protecting the objects identified in the proclamation on the majority of lands within the northern portion of the Monument and that therefore grazing could continue on those lands.  This Court held that determination was arbitrary and capricious because it was based on a flawed and unsupported analysis.  Because the 2012 RMP

Record of Decision relied on the arbitrary compatibility determination to allow continued livestock grazing on the Monument, the Court ruled that aspect of the decision was unlawful and remanded it to the agency to conduct a proper livestock compatibility determination.

5.      Since the agency issued its prior analysis in 2012, little or no grazing has occurred on the allotments within the Monument.  After five to ten years of non-use, many areas are recovering from the prior degradation caused by livestock, with increasing vegetation and reduced signs of cattle impacts.  Rather than furthering this recovery, BLM's new grazing analysis uses it as an excuse to allow future grazing across *all* lands in the northern part of the Monument—expanding use beyond that allowed under the 2012 decision.  This new decision is just as flawed as the prior one, again incorporating irrational and unsupported analysis and conclusions—including relying entirely on new data collected after years of no grazing to assess the impacts of grazing. Even areas that still have degraded ecological conditions due to prior cattle use are available for future grazing under BLM's new decision.

6.      Rather than fixing its prior analysis to adequately protect the Monument objects, BLM chose to issue yet another unscientific grazing decision that protects *no* land from livestock grazing—ensuring that the recovery occurring over the past ten years will be reversed and grazing will again harm many of the biological and cultural resources on the Monument.  This new decision, which relies on an equally flawed and unsupported analysis that fails to protect the Monument objects, violates the Federal Land Policy and Management Act ("FLPMA"), the National Landscape Conservation System ("NLCS") Act, the National Environmental Policy Act (NEPA), and the National Historic Preservation Act ("NHPA").  Accordingly, this Court should once again hold BLM's livestock grazing compatibility analysis, environmental assessment, and RMP amendment arbitrary, capricious, an abuse of discretion, and contrary to law, and under 5 U.S.C. § 706(2)(A) set them aside as unlawful agency action.

**JURISDICTION AND VENUE**

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.;* the National Landscape Conservation System Act, 16 U.S.C. § 7202; the Sonoran Desert National Monument Proclamation, Proclamation No. 7397, 66 Fed. Reg. 7354; the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.;* the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*; the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. § 2214 *et seq.* An actual, justiciable controversy now exists between Plaintiffs and Defendant, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district and a substantial part of the public lands and resources at issue are located within this district.

9.      The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

**PARTIES**

10.      Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a regional, membership, not-for-profit conservation organization, dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP has offices throughout the West, including in Tucson, Arizona, and more than 12,000 members and supporters located throughout the United States.  Through agency proceedings, public education, scientific studies, and legal advocacy conducted by its staff, members, volunteers, and supporters, WWP is actively engaged in protecting and improving plant and animal communities and other natural resources and ecological values of western watersheds.  Since 2007, WWP has actively participated in management of livestock grazing on the Sonoran Desert National Monument through

letters, comments, field trips, and oral communications to the BLM, expressing its concerns over livestock grazing on the Monument. WWP provided extensive comments on the draft environmental assessment ("EA") challenged here and submitted a timely protest of the Proposed RMP amendment and Final EA.

11.     Plaintiff GRAND CANYON CHAPTER OF THE SIERRA CLUB is one of the oldest grassroots environmental organizations in the country.  The Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.  The Grand Canyon Chapter has long been committed to protection of Arizona's lands, wildlife, water, and communities and has been significantly involved in activities related to the Sonoran Desert National Monument, including the management of livestock grazing.  The Sierra Club has participated in the planning process for the Monument, including participating in public meetings, submitting comments on the Draft EA at issue here, and a protest of the proposed RMP amendment and Final EA.

12.     Plaintiffs' staff and members regularly use and enjoy the public lands, wildlife, and other natural resources on the Sonoran Desert National Monument for many health, recreational, scientific, spiritual, educational, aesthetic, and other purposes.  WWP and Sierra Club staff and members pursue activities such as hiking, wildlife viewing, biological and botanical research, photography, and spiritual renewal on the Sonoran Desert National Monument.  Livestock grazing that degrades this fragile ecosystem impairs the use and enjoyment of this Monument by Plaintiffs' staff and members. Plaintiffs' staff and members have observed grazing impacts that have adversely affected native plants, desert soils, and wildlife habitat on the Monument, which reduces their enjoyment when they visit the Monument for their various activities.  WWP and Sierra Club have submitted to BLM photographs of livestock impacts on the Monument on numerous occasions.

13.     Plaintiffs' staff, members, and supporters will continue to visit the Sonoran

Desert National Monument in the future for many purposes such as hiking, wildlife viewing, photography, scientific study, spiritual renewal, and to otherwise enjoy the natural scenery and beauty of the Sonoran Desert.  Plaintiffs, both organizationally and on behalf of their staff, members, and supporters, have an interest in the preservation and protection of the Sonoran Desert National Monument, and are directly harmed by Defendant's violations of law challenged herein.

14.     The above-described conservation, recreational, scientific, and aesthetic interests of Plaintiffs' staff, members and supporters have been, are being, and, unless the relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendant's violations of law.  Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate.

15.     Defendant BUREAU OF LAND MANAGEMENT ("BLM") is an agency or instrumentality of the United States, and is charged with managing the public lands and resources of the Sonoran Desert National Monument, in accordance and compliance with federal laws and regulations.

## FACTUAL BACKGROUND

**A.     Sonoran Desert National Monument**

16.     The Sonoran Desert is a hot, arid region that stretches between southwest Arizona, southeast California, and northern Mexico.  The Sonoran Desert has remarkably high biological diversity for both plants and animals.  This desert is well known for its "cactus forests" of saguaros, but is also home to other trees such as paloverde, desert ironwood, and mesquite, a variety of shrubs, and many species of ephemeral plants that arise after seasonal rains.

17.     These varied plant communities provide habitat for a plethora of wildlife. The Sonoran Desert has over 2,000 native plant species, many of which are endemic to the Sonoran Desert, as well as 60 species of mammals, 350 species of birds, 20 species of amphibians, and more than 100 species of reptiles that inhabit the area.

18.     One of the defining characteristics of the upland Arizona portion of the

Sonoran Desert is the bi-seasonal rainfall pattern, with winter rains coming from the Pacific and summer moisture coming from tropical monsoons.  Years with good precipitation result in large populations of annual wildflowers while other years result in drought and much less annual plant production.  The mild winters rarely experience frost and thus almost half of the biota of this region is tropical in origin.

19.     Livestock grazing, off-road vehicle use, encroachment of agriculture and human development, climate change, and the introduction of non-native species are the primary threats facing the Sonoran Desert ecosystem.

20.     Amidst this unique ecosystem, President Clinton established the Sonoran Desert National Monument in 2001 pursuant to his authority under the Antiquities Act. In Presidential Proclamation 7397, President Clinton set aside this area to protect its resources from development and degradation.  The Monument is located about 60 miles southwest of Phoenix, Arizona and encompasses 496,337 acres.

21.     The proclamation begins by noting that the Monument is a "magnificent example of untrammeled Sonoran desert landscape."  This desert ecosystem has "an extraordinary array of biological, scientific, and historic resources.  The most biologically diverse of the North American deserts, the Monument consists of distinct mountain ranges separated by wide valleys, and includes large saguaro cactus forest communities that provide excellent habitat for a wide range of wildlife species."

22.     The proclamation continues by discussing the "spectacular diversity of plant and animal species" there.  The higher peaks on the Monument contain unique woodland communities, while lower elevation lands "offer one of the most structurally complex examples of paloverde/mixed cacti association in the Sonoran Desert."  The proclamation highlights the saguaro cactus forests, stating that these forests, with their signature saguaro plants together with a wide variety of other trees, shrubs, and herbaceous plants, are "an impressive site to behold" and "a national treasure."

23.     In discussing the lower-elevation, flatter areas of the Monument, the proclamation highlights the creosote-bursage plant community, which thrives in open

expanses between mountain ranges and acts as a connector to other plant communities. The Monument also contains desert grasslands and ephemeral washes, which support denser vegetation such as mesquite, ironwood, paloverde, and desert willow trees, as well as a variety of herbaceous plants.  This vegetation provides dense cover for bird species for nesting, foraging, and escape, and "birds heavily use the washes during migration."

24.     Of particular relevance here, the proclamation remarks on the rich diversity, density, and distribution of plants in the Sand Tank Mountains area on the Monument, which is due to the management regime in place in that particular area that excluded livestock grazing there for more than fifty years.[1]  The proclamation stated that in order to extend the extraordinary diversity and overall ecological health of the Sand Tank Mountains area, adjacent Monument lands with similar biological resources should be subject to similar management "to the fullest extent possible."

25.     Wildlife diversity is also a focal point of the proclamation.  "The diverse plant communities present in the Monument support a wide variety of wildlife, including the endangered Sonoran pronghorn, a robust population of desert bighorn sheep, especially in the Maricopa Mountains area, and other mammalian species such as mule deer, javelina, mountain lion, gray fox, and bobcat."

26.     The proclamation makes note of other mammals, birds, reptiles, and amphibians on the Monument.  More than 200 species of birds are found on the Monument including many raptors and owls.  Reptiles such as the red-backed whiptail and the Sonoran desert tortoise inhabit the Monument.  Because of its declining numbers, the U.S. Fish and Wildlife Service has determined that the Sonoran desert tortoise is a candidate species for listing under the Endangered Species Act. The Monument contains more than 150,000 acres of key tortoise habitat.

27.     In addition to the biological resources on the Monument, the proclamation

---

[1] This area was withdrawn for military purposes in 1941.  Pursuant to the proclamation, the military withdrawal terminated on November 6, 2001 and BLM has assumed management responsibility.

also stresses the importance of the "many significant archaeological and historic sites, including rock art sites, lithic quarries, and scattered artifacts."  The Monument contains remains of prehistoric Indigenous travel corridors and villages as well as remnants of several important historic trails, including the Juan Bautista de Anza National Historic Trail, the Mormon Battalion Trail, and the Butterfield Overland Stage Route.

28.     In light of these biologic and historic values, President Clinton used his authority under the Antiquities Act to create the Sonoran Desert National Monument "for the purpose of protecting the objects identified above."

29.     To further this purpose, the proclamation prohibited motorized and mechanized vehicle use off roads and withdrew the land from any form of entry, sale, leasing, or other disposition, including for mining or mineral development.

30.     The proclamation also prohibited BLM from renewing livestock grazing permits for all Federal lands within the Monument south of Highway 8 at the end of their term; and stated that grazing on Federal lands north of Highway 8 "shall be allowed to continue only to the extent that the Bureau of Land Management determines that grazing is compatible with the paramount purpose of protecting the objects identified in this proclamation."[2]

31.     According to the proclamation, BLM was required to prepare a management plan that addresses the actions necessary to protect the objects identified in the proclamation.  In light of the proclamation designating this area as a National Monument, BLM no longer manages the area simply on a multiple use basis but instead must manage it primarily for the protection of the objects of interest identified in the proclamation.

**B.     Livestock Grazing on the Monument**

32.     The majority of the land now encompassed within the Sonoran Desert National Monument was grazed by livestock for many decades.  The Sand Tank

---

[2] Highway 8 crosses the Monument from east to west.  Slightly more than half of the Monument occurs north of the Highway.

Mountains area, mentioned above, in the southwest corner of the Monument was the only substantial area that had not been recently impacted by livestock prior to designation of the Monument.

33.     As of February 28, 2009, the Monument lands south of Highway 8, which included part of the Big Horn and other allotments, were permanently closed to livestock grazing pursuant to the proclamation.  To the north of Highway 8 is the remainder of the Big Horn allotment, as well as the Lower Vekol, Conley, Hazen, Beloat, and Arnold allotments.  The portion of these northern allotments that fall within the Monument are the subject of BLM's livestock grazing compatibility analyses.

34.     Grazing permits for these allotments allow for two types of grazing: perennial and ephemeral.  Perennial grazing authorization allows for a certain number of cattle to graze the allotment during a certain period of time each year for the ten-year term of the permit.

35.     Ephemeral grazing authorization allows for additional grazing on a seasonal basis when rainfall provides adequate forage.  Depending on the seasonal forage production, BLM authorizes a certain number of cows to graze for a limited time.  On the Monument, ephemeral grazing occurs primarily when winter rains trigger sufficient forage production, generally in the form of annual plants and wildflowers that carpet the desert floor.

36.     Prior to the initial grazing compatibility analysis for the Monument, the permits for the allotments north of Highway 8 authorized ephemeral use on the Arnold allotment and perennial/ephemeral use on the remaining five allotments.  The perennial use was year-long and ranged from 101 to 559 cattle and 1,164 to 6,104 Animal Unit Months ("AUMs") per allotment.  An AUM is the amount of forage needed to sustain a cow and calf pair for one month.

37.     It is well recognized that livestock grazing in the Sonoran Desert can have significant impacts on the natural and cultural resources there.  Grazing use has resulted in compaction and erosion of soils, destruction of biological soil crusts, reduction in

vegetation cover, loss of native plant diversity, increase in non-native plants, and altered plant community structure and composition.  This damage to vegetation also degrades wildlife habitat.

38.     Compaction of soils by livestock inhibits water infiltration and increases surface water run-off, thereby increasing erosion of surface soil and decreasing the water available to vegetation.  Depletion of vegetative cover by livestock and the resultant increase in bare ground also increases soil erosion.  This loss of vegetation cover and soil has long-term impacts to soil and plant productivity and the hydrology of watersheds.

39.     Destruction of biological soil crusts also impairs ecological functions.  Soil crusts are important assets to plant growth, enhancing plant uptake of nutrients and nitrogen, which is particularly important in nitrogen-limited desert ecosystems.  These crusts provide favorable sites for germination of native plant seeds, and hinder germination of non-native seeds that prefer disturbed sites.  Soil crusts also help prevent water and wind erosion. Recovery of soil crusts from disturbance can take years or even decades.

40.     Plant community structure on the Sonoran Desert National Monument generally consists of an understory of perennial and annual grasses and forbs[3], a mid-story of shrubs, cacti, and small trees, and an overstory of somewhat larger trees as well as saguaro cacti.  In the driest areas of the Monument, trees, shrubs, and grasses are confined to drainages where supplemental water supports diverse plant communities.  Because of the dry climate, overall plant productivity is low, particularly during periods of drought.

41.     Cattle usually prefer to eat grasses, but will also eat forbs and browse shrubs and small trees if grasses are unavailable. Because of their forage preferences, cattle alter the natural structure of communities by grazing the understory or mid-story more heavily, reducing the abundance of plants in the understory and favoring expansion

---

[3] Forbs are broad-leaved herbaceous plants other than grasses, sedges, or rushes, and include a variety of wildflowers.

of trees and shrubs.  Where vegetation is reduced by grazing, the plant community may not recover unless grazing is discontinued because of the normally low productivity in the desert.

42.    Grazing significantly reduces native plant diversity and changes the composition of the plant community by eliminating plants that are sensitive to grazing and allowing only those plants more adapted to disturbance to grow.  Often native species, especially native grasses, are replaced with non-native invasive species because cattle prefer the native species, selecting them as forage and allowing invasive species to spread. These non-native species often increase the risk of wildfire.

43.    Livestock are particularly detrimental to saguaro cactus communities because cattle trample saguaro seedlings, and also graze understory plants and grasses that provide shade and structural protection for the seedlings and juvenile cacti. Because saguaros stay small for decades, they remain vulnerable to the threat of livestock grazing for many years before outgrowing the direct threat posed by cattle trampling. Saguaros growing in the shelter of leguminous trees (known as "nurse plants") are especially at risk because these same trees are the only source of shade for livestock in the hot desert and thus attract heavy use by livestock.

44.    The consumption and trampling of vegetation by livestock reduces forage and cover for many wildlife species, including birds, small mammals, insects, and other native herbivores like deer and pronghorn.  Many animals in the Sonoran Desert are highly dependent on seasonal pulses of plant productivity that occur in response to rain events.  Ephemeral grazing that occurs during those same periods is particularly detrimental to the survival and reproduction of those species.  Many wildlife species also heavily rely upon desert washes for protection, movement corridors, and food, but livestock often congregate in these areas, removing forage and eliminating protective cover for wildlife.

45.    Grazing infrastructure such as water developments and fences can directly and indirectly harm wildlife.  Water developments that remove water from washes impact

downgradient vegetation, which is important to native wildlife for food and cover.  These developments also create "sacrifice zones" of extreme degradation of vegetation and soil, as well as high levels of non-native plants, because of the concentrated presence of livestock at these sites.  Fences also fragment habitat, limit movement of large mammals, and entangle and ensnare untold numbers of wildlife each year.

46.     Many of the species directly named in the Sonoran Desert National Monument proclamation are negatively impacted by livestock grazing, such as Sonoran desert tortoise and desert bighorn sheep. For instance, cattle eliminate nutritionally important forage for desert tortoise adults and hatchlings, which depend heavily on availability of plants after seasonal rainfall events.  Thus, ephemeral grazing is particularly detrimental to the tortoise.  Cattle can also trample and crush individual tortoises or their burrows.  Livestock operations affect desert bighorns by removing forage, impairing bighorn movements through fencing, and excluding bighorns from suitable habitat, movement corridors, or water sources because bighorns tend to avoid cattle.

47.     Finally, cattle damage cultural and historical sites by trampling artifacts and other features on the soil surface and rubbing against and knocking over historic structures.  They also induce changes in plants and soils that lead to erosion and gullying which can displace or bury archaeological sites, as well as change the visual nature of the cultural landscape.

**C.     Pacific Biodiversity Institute and Nature Conservancy Research**

48.     Not long after the Sonoran Desert National Monument was established, BLM entered into contracts with The Nature Conservancy and the Pacific Biodiversity Institute ("PBI") to study the ecological condition of and livestock grazing impacts to the Monument. Fieldwork for the PBI studies occurred from 2002 to 2006 and several reports were completed, which included maps of the various natural communities on the Monument as well as assessments of the ecological condition of each community and the stressors that affected each community.

49.     The results of the PBI studies indicated that the communities most heavily used by livestock had the most disturbance in the form of decreased vegetation cover, diminished native species diversity, high levels of non-native species—especially in forb and grass cover, and soil erosion and compaction.  These communities were at the lower elevations of the Monument and included the creosote-bursage community, some of the paloverde-mixed cacti community, and desert wash communities.

50.     The creosote-bursage community, one of the most widespread natural communities on the Monument, was where most of the livestock grazing occurred and likewise was one of the most disturbed communities.  As noted by the report, "[t]he influence (stresses) of livestock extends throughout most of the community, as few of the regions we visited within the study area are without some indication of livestock influence."

51.     In contrast, the communities least accessible to livestock—such as the higher elevations of paloverde-mixed cacti, mountain uplands, and rocky outcrops—had few exotic species, high diversity of native plants, and little soil disturbance.  However, in 2005 and 2006, signs of livestock use were seen even in these higher elevation areas.  Surveyors speculated that this new use was due to the extreme drought and decreased availability of forage in the lower elevations.

52.     The native grasslands also showed a contrast between grazed and ungrazed areas, with the grazed grasslands on the Monument showing significant disturbance and poor conditions while ungrazed grasslands on adjacent property were in much better condition and had much higher levels of native grasses.  In looking specifically at grazed valley riparian areas, the study noted that these areas on the Monument had a high abundance of exotic grasses and very low abundance of native grasses, and that the native grass cover was being reduced by livestock activity.

53.     The reports also documented that communities most affected by grazing, such as the lands around water sources and other range developments, had the most severe degradation, with highly altered vegetation composition and structure and altered

1   soil surfaces.

2       54.    The PBI reports concluded that most of the study's sample plots would fail

3   to meet BLM's criteria for rangeland health.

4       55.    A separate report issued by The Nature Conservancy assessed existing

5   scientific research on impacts of livestock grazing in the Sonoran Desert as well as the

6   PBI studies.  The report noted that the Sonoran Desert has unique ecological

7   characteristics, and the grazing systems being used were not appropriate for the Sonoran

8   Desert ecosystem because they were strategies meant for areas with higher productivity.

9   The report concluded that no known system of grazing is compatible with protecting the

10  Sonoran Desert ecosystem and its resources.

11  **D.      BLM 2012 Analysis and Decision**

12      56.    Shortly after the PBI studies were completed, BLM wrote a thirteen-page

13  memo for the State Director in October 2007 laying out its rationale for determining that

14  "livestock grazing is not compatible with the paramount purposes of protecting the

15  objects of the monument and therefore the SDNM should be closed to livestock grazing."

16  It noted that rangeland health standards were not being met on each allotment—

17  particularly around water sources and other congregation areas; livestock were negatively

18  affecting vegetation and wildlife habitat—especially for desert tortoise; continuing

19  drought was adding to the stress caused by ongoing grazing to plants and wildlife; and no

20  other grazing regimes would allow grazing to be compatible.

21      57.    In October 2009, BLM drafted a lengthy Determination of Compatibility

22  that likewise concluded livestock grazing was not compatible with protection of the

23  objects identified in the Monument proclamation.  Even grazing at light to moderate

24  levels was harmful to vegetation, wildlife, and the Juan Bautista de Anza National

25  Historic Trail on the Monument. In contrast, nearby lands without grazing were in much

26  better shape.  BLM concluded there were no feasible alternate grazing management

27  strategies that would substantively reduce impacts and therefore grazing was

28  incompatible with protecting the Monument objects. But BLM never finalized that 2009

compatibility determination.

58.     Instead, BLM initiated yet another analysis to make its grazing compatibility determination.  As the first step of that process, BLM identified the Monument objects that must be protected:  Functioning desert ecosystem; Diversity of plant and animal species; Saguaro cactus forests; Sand Tank Mountains; Vegetation communities: creosote-bursage, desert grassland, and washes; Wildlife; and Archaeological and historic sites.

59.     Disregarding the PBI studies, BLM conducted its own Land Health Evaluation ("LHE") to assess the ecological condition of the six grazing allotments north of Highway 8.  This evaluation assessed whether ecological conditions were meeting the Arizona Standards for Rangeland Health regarding soil conditions and production and diversity of native plant communities.  BLM used these standards as proxy measurements for determining harm to all Monument objects.

60.     BLM had collected data over the years to assess ecological conditions, primarily at "key areas"—monitoring sites that were considered representative of average livestock use and impacts.  To assess whether native plant communities were meeting the rangeland health standard, BLM compared this monitoring data to "desired condition objectives" for various ecological sites (i.e., whether actual conditions were meeting desired conditions).  Sites that met objectives were deemed to be meeting the native plant community Standard for Rangeland Health.

61.     BLM found a significant amount of area in the allotments north of Highway 8 was not meeting the rangeland health standard for native plant communities—a total of more than 128,500 acres constituting just over 50% of all Monument lands north of Highway 8.

62.     The next step in the LHE process was to determine whether livestock grazing was a significant causal factor in not achieving the native plant community standard.  BLM made this causality determination based on livestock use levels during a

single year, which was assessed through utilization monitoring[4] on two allotments as well as mapping of livestock "use patterns" from visual observations along roads.  When assessing use levels, BLM monitored use of perennial shrubs and did not assess use of perennial grasses or annual plants.  Nor did BLM consider whether cumulative livestock use over many years had contributed to long-term changes in native plant composition or the elimination of perennial grasses from most of the Monument.

63.    For areas that had not met the native plant community rangeland health standard, BLM assumed livestock was the causal factor where grazing use was >40% based on the single year of use monitoring.  Areas with <40% grazing use that particular year were assumed to be failing the standard due to other reasons.

64.    Based on this 40% use threshold, BLM concluded that livestock grazing was the causal factor for non-attainment of the native plant community standard on just 8,498 of the 128,500 acres that were failing the standard in the northern portion of the Monument.  Breaking it down by vegetation community showed that 106,010 acres out of 151,643 total acres (70%) in the lower elevation creosote-bursage community were not achieving the rangeland health standard for native plant communities, but current grazing practices were the causal factor for only 7,980 acres.  The desert wash community had 294 miles out of 490.5 total miles (60%) not meeting the plant community standard, but livestock was the causal factor on just 12 miles. In the higher elevation paloverde-mixed cacti vegetation community, 21,539 of 87,366 total acres (25%) failed to meet the standard and grazing was the cause on just 511 acres.

65.    For the saguaro forests, BLM asserted that the results of the PBI studies indicated saguaro cacti recruitment was not being affected by livestock even though the author of the PBI reports disagreed with that conclusion in his comments on the LHE.

66.    BLM used the LHE analysis as the basis for its final grazing compatibility determination.  BLM's determination did not recommend closing all lands north of

---

[4] Utilization monitoring measures the percentage of forage that has been consumed or destroyed by cattle in the current year.

Highway 8 to grazing, as it had concluded in 2009, but instead just closed the areas that failed standards due to grazing.  BLM stated that if existing grazing use was a significant causal factor for non-achievement of rangeland health standards, then such grazing is not compatible with the protection of the objects of the Monument.  Therefore, livestock grazing was incompatible with protecting Monument objects on 8,498 acres and would be unavailable in those areas.

67.     BLM incorporated the LHE and compatibility determination into the Environmental Impact Statement ("EIS") for the Monument management plan.  The EIS analyzed five alternative actions that varied in proposed management for certain activities like travel and public access, recreation, energy development, and livestock grazing.

68.     With regard to livestock grazing, the alternative actions varied in the acreage and type of grazing allowed on the six Monument allotments north of Highway 8.  The no action alternative maintained the status quo grazing while the other alternatives closed various areas to grazing, from a minimum of the 8,500 acres that were incompatible with protecting Monument objects up to all 252,500 allotment acres north of Highway 8.

69.     The EIS discussed generally the impacts that livestock grazing can have on soils, plant communities, wildlife, and cultural sites but provided little detail related to specific impacts occurring on the Monument other than the results of the LHE.  The EIS acknowledged that many wildlife species, including bighorn sheep and Sonoran desert tortoise, are present on the Monument but did not describe the specific impacts cattle grazing was having on any particular species.

70.     In September 2012, BLM issued the Record of Decision and Approved Resource Management Plan ("RMP") for the Sonoran Desert National Monument.  It noted that the LHE and grazing compatibility determination formed the basis of the decision in the RMP with regard to continued livestock grazing on the Monument.

71.     This decision closed to grazing the 8,500 acres where grazing was incompatible with protecting Monument objects, another 36,300 acres that surrounded or

were connected to those 8,500 acres and would be excluded from grazing through fencing and natural topographic features, and the entirety of the Conley allotment.  The Conley allotment was closed because it had the most acreage incompatible with grazing, and future management options for the remaining available portion would be limited due to the amount and location of fencing that would be required to exclude livestock from the incompatible areas.

72.     In all, the decision eliminated grazing on 95,290 acres and allowed it to continue on 157,210 acres.  The majority of acres closed to grazing were on the Conley allotment, with additional acres closed on the Big Horn allotment and a small amount on the Lower Vekol allotment.  No acres were closed on the Arnold, Beloat, or Hazen allotments.

73.     Under this decision, the Arnold allotment was still authorized for ephemeral use only, the Conley allotment was reduced to year-long perennial use of 40 cattle/464 AUMs, while the other four allotments continued with year-long perennial use ranging from 101 to 300 cattle and 1,164 to 2,988 AUMs.[5]

**E.      Successful Legal Challenge to the 2012 EIS and RMP**

74.     Western Watersheds Project and Sierra Club filed a lawsuit against BLM over the livestock grazing portion of the RMP in April 2013.  In their lawsuit, the groups alleged violations of NEPA because the RMP EIS was flawed by relying on a land health evaluation and grazing compatibility determination that were arbitrary and capricious. The plaintiffs claimed that BLM's grazing analysis ignored relevant data, failed to explain and support its methods, assumptions and conclusions, failed to assess all direct, indirect, and cumulative effects of grazing on Monument resources, and failed to respond to opposing scientific viewpoints.

75.     Due to these flaws, plaintiffs alleged that BLM did not take the required

---

[5] These figures include the permitted use on portions of the allotments that fall outside of the Monument boundary, which was why the Conley allotment was still permitted for a small amount of use.

"hard look" at the impacts of its proposed grazing, failed to insure that the information in the EIS was of high quality and that the scientific analysis was accurate, failed to identify the methodology and scientific sources relied upon for the agency's conclusions, and failed to disclose and discuss responsible opposing viewpoints, in violation of NEPA.

76.     This court agreed with many of the plaintiffs' claims and found the LHE was arbitrary and capricious in a February 2015 ruling. First, the court considered how BLM identified the desired plant community objectives it used to assess the ecological condition of allotments. Over the course of the LHE process, BLM had adjusted many of the objectives, which resulted in objectives that were easier to meet in the final LHE compared to earlier drafts.   The court determined that BLM did not provide an adequate explanation in the record to support its setting of, and adjustments to, these objectives.

77.     Next, the court looked at the data BLM used to determine whether allotments were meeting the desired plant community objectives.  BLM excluded from its analysis much of its own monitoring data from before 2009 and almost 85% of the PBI data, including all data collected in areas near livestock water sources. The court concluded this aspect of the analysis was also flawed because BLM's use of monitoring data was inconsistent and it failed to adequately explain and support its exclusion of certain data.

78.     Regarding the determination of whether grazing caused the failure to meet desired plant community objectives, the court held that BLM did not justify its reliance on a single year of utilization data and it failed to address peer reviewers' comments that a single year of data is not sufficient to determine causality and also does not account for long-term effects to perennial vegetation.[6] Therefore, BLM's causality determination was arbitrary and capricious as well.

79.     Because the court concluded that "BLM has failed to adequately explain

---

[6] BLM had provided the LHE to four external peer reviewers, several of whom had critical comments on the LHE process that BLM failed to address.  One comment was that multiple years of vegetation and utilization data are needed to have a reliable analysis.

some of its decisions that led to the LHE and compatibility determinations, and failed to address significant concerns raised in peer reviewers' comments," it held the LHE was arbitrary and capricious.  The court, however, gave BLM an opportunity to cure the defects in the LHE by allowing it to file a supplemental report that provided the required reasoned explanations and responses, or indicated that it would adopt a different decision.  In the meantime, the court remanded the RMP to BLM without vacating it, allowing the RMP to remain in place for the time being.

80.    BLM filed a supplemental report in May 2015 that attempted to provide the missing explanations and support identified in the court's ruling regarding identification of desired plant community objectives, determination of whether those objectives were being met, and determination of whether grazing caused the non-achievement of objectives.  The plaintiffs asserted that much of the information in the report was an unlawful post hoc explanation not found in or supported by the record, and further the report did not provide the missing explanations and support for the decisions in the LHE.

81.    The court issued a second summary judgment order in May 2016, again ruling in favor of the plaintiffs.  It held that the "vast majority of the information in the supplemental report [was] not sustained by the record and/or provide[d] a new rationalization" that was inappropriate and thus did not cure the NEPA violations.

82.    Specifically, the court held that the supplemental report did not provide citations to the administrative record that sustained the explanations for identification of plant community desired condition objectives and instead set forth a new rationalization for BLM's decisions.  It also held that the report's explanation for why BLM excluded certain data when determining whether plant community objectives were being met was a new rationalization that was inconsistent with the agency's previous explanations and evidence in the record.  Finally, as to the determination about whether livestock grazing caused the failure to meet plant community objectives, the court held that BLM's report did not explain why using only one year of utilization data from an above average precipitation year provided accurate and sound conclusions regarding causation.  Nor did

the report show that BLM had responded to critical comments from a peer reviewer about use of only the 2009 data to determine causation.

83.    Thus, once again the court held the LHE was arbitrary and capricious.  It ordered BLM "to complete a new LHE and compatibility determination under NEPA and incorporate those decisions into the RMP."  However, it did not vacate the RMP and therefore grazing under the RMP would continue while BLM completed its new grazing determination.

84.    Due to the extreme length of time it took BLM to complete its first analysis, the Court set a deadline of September 30, 2020 for BLM to complete the new LHE and compatibility determination under NEPA and incorporate those decisions into the RMP.  It also ordered BLM to file annual status reports on its progress toward completion of those requirements.

**F.    BLM's 2020 Land Health Evaluation.**

85.    During the course of the litigation over the 2012 analysis, grazing on the Monument decreased substantially.  Within the Monument, the Big Horn and Hazen allotments have not been grazed since at least 2009, the Lower Vekol allotment has not been grazed since 2010, the Conley allotment was grazed only once since 2012,[7] and the Beloat and Arnold allotments—which are used primarily for ephemeral use—have not been grazed since 2015.

86.    BLM had conducted more monitoring at key areas on and outside the Monument in 2012-2014, using the same methods as its 2009 monitoring.  These methods followed standard monitoring protocols outlined in BLM technical references, which was one of the few aspects of the 2012 LHE that was not challenged in the prior litigation.  The agency incorporated this data into a 2014 LHE that assessed rangeland conditions of allotments both within and outside the Monument boundaries.  It compared

---

[7] The Monument portion of the Conley allotment should have been fully closed since 2012 but BLM erred and authorized grazing there in 2015 by mistake.  It ordered the cows be removed in early 2016 when it discovered its mistake.

data from different years to determine trends, finding that some sites had an upward trend while others continued to remain below standards.

87.     For the new court-ordered LHE, BLM again collected data at the key areas in 2017-2018 but also set up new plots and used new methods to collect data at those plots in 2017-2018.  Then BLM decided to ignore all of its key area data, as well as the PBI data, much of which were collected when cattle were still using all or many of the Monument allotments.  Instead, it relied only on the 2017/2018 data from the new monitoring methods, collected after multiple years of little to no grazing, to assess the impacts of livestock grazing on Monument objects.  Despite the court's concerns in the previous case about relying on just one year of data, BLM took the same approach for the 2020 LHE without explaining why that was adequate.

88.     Like in the prior LHE, BLM assessed compliance with rangeland health standards for soils and native plant communities as proxy measures to determine livestock impacts on all of the Monument's biological objects.  Its assessment again only evaluated perennial plant species and did not consider impacts on annual plants even though BLM admitted that cattle prefer annual forage and will consume that first.  BLM looked at conditions within the same seven "ecological sites" evaluated in the 2012 LHE.[8]

89.     For the new LHE, BLM changed how it determined the desired plant community objectives.  In the prior LHE, BLM based objectives on ecological conditions found in reference sites south of Highway 8 that had not been grazed for decades.  In contrast, for the new LHE BLM assumed that areas on allotments north of Highway 8 more than two miles from livestock water sources were not used by cattle and thus were in a "natural" state to establish reference plant community objectives.  BLM failed to verify that cattle have had no effect on such areas.  As discussed below, BLM's own data

_____

[8] An ecological site is a landscape unit that has distinctive soil and topographic features that result in a characteristic natural plant community.  With some slight name changes, the ecological sites evaluated in the LHEs consist of sandy bottom, sandy loam deep, sandy loam upland, limy fan, limy upland, limy upland deep, and granitic upland.

shows that signs of livestock use occurred in many areas the agency assumed were not used by cattle.

90.     BLM averaged the vegetation data from these "natural" plots within each ecological site and then set the objectives one standard deviation below the average.  It did not explain why it lowered the objective below the average of the plots.  In comparing the "plant cover" objectives to the prior LHE, all but one of the seven ecological sites had lower objectives in the 2020 LHE than in the 2012 LHE, meaning that the 2020 objectives were easier to meet.

91.     Using its new monitoring methods, BLM collected data at 124 random plots within the seven ecological sites on the allotments both in and outside the Monument boundary.  BLM established 3-5 plots per ecological site per allotment.  It compared the data collected at these plots to the ecological objectives from the "natural" sites to determine if the site was meeting the rangeland health standards.  To achieve the standards, more than half the plots in an ecological site on an allotment must meet objectives for more than half of the attributes measured.

92.     Based on the single year of monitoring data collected at each plot in 2017 or 2018, BLM determined the areas on each allotment that were not meeting the soil or plant community standards.  After years of significantly less cattle use on the allotments, BLM found fewer acres failing standards than in the 2012 LHE but still determined thousands of acres on the Monument were not achieving one or both standards.  In the creosote-bursage community, 46,672 acres were failing the soil standard and 42,747 acres were failing the plant community standard; in the paloverde-mixed cacti community, 5,327 acres were failing the soil standard and 14,289 acres were failing the plant community standard; and in the desert wash community, 42 miles were failing the soil standard and 86 miles were failing the plant community standard.  Like in 2012, the Conley allotment had the most acres failing standards, followed by the Big Horn allotment.  Areas within the allotments but outside the Monument that had been grazed more recently had even more plots that failed standards.

93.     BLM then tried to determine whether livestock grazing was a factor in failing to achieve rangeland standards.  It could not use utilization data for this determination because the allotments had not been used recently—some for as long as ten years.  Instead, it developed a "livestock use probability map" that depicted areas as one of five use classes:  high probability (class 1), moderate/high probability (class 2), moderate probability (class 3), moderate/low probability (class 4), and low probability (class 5).  BLM used a GIS program to map these use probability classes based on the distance to reliable water sources and characteristics of the terrain.  It relied on the following assumptions for this modelling: (1) cattle do not move more than two miles from water on flat terrain or more than one mile in rough terrain; (2) fencing is an impassable barrier; and (3) cattle do not use certain terrain, including high elevation areas, areas >30% slope, or rocky terrain.

94.     During its 2017-2018 monitoring, BLM documented signs of livestock use at the plots, such as livestock trails, hoof action, or manure.  BLM concluded that grazing was likely a causal factor in not achieving rangeland health standards if the failing plot was in use probability classes 1-4 *and* had signs of livestock use.  BLM determined that grazing was not a causal factor for any plot in probability use class 5 because it assumed cattle never or rarely use those areas.

95.     BLM did not attempt to verify its assumption that cattle do not use areas mapped as probability use class 5.  Monitoring information shows that assumption is invalid.  Of all the plots monitored in 2017-2018 mapped within probability use class 5 on the Conley, Big Horn, Beloat, and Lower Vekol allotments, more than half had signs of livestock use—24 out of 45 plots.  BLM itself acknowledged in the 2020 LHE that almost half of the plots failing standards that occurred in probability use class 5 had signs of livestock use, but still did not use its monitoring information to verify the assumption that all areas modelled as class 5 had little or no livestock use.  Nor did BLM use any prior utilization data to validate the probability use map.

96.     An overlay of modelled probability use class 5 with the 2009 use pattern

map shows more than "negligible" use occurred in 2009 across the vast majority of probability use class 5.  Many areas on the 2009 use pattern map with 6-21% and 21-40% use, and some areas of 41-60% and 61-80% use, occur within the 2020 modelled probability use class 5.  Even the early PBI study showed moderate intensity livestock use up to 2 ½ miles from water sources, and that in drought years, cattle moved even farther—including up into rocky slopes and mountains.

97.    BLM's modelling of probability use class 5 also did not account for the fact that if livestock resume use on all of the allotments, many water sources that are now non-functional would need to be repaired or rebuilt.  Areas around those water sources would therefore receive heavier use and would no longer fall within probability use class 5. For instance, the Monument portions of the Hazen and Lower Vekol allotments have no functioning water sources.  To use those areas, it would be necessary to rebuild water sources, which would substantially increase livestock use and impacts on those allotments.  BLM failed to incorporate that information into the LHE.

98.    BLM relied on the unverified probability use map and its observations of livestock signs in 2017-2018 to claim that livestock were not the causal factor for most of the areas that were failing to achieve rangeland standards.  Its conclusions in the LHE about whether current or historic livestock use was causing the non-achievement of standards were confusing and inconsistent.[9]

99.    For the areas that failed to meet standards due to livestock grazing, BLM did not recommend in the 2020 LHE that grazing be discontinued, as it did in 2012. Rather, it claimed that grazing could continue in those areas with "modifications" such as seasonal, deferred, or rotational grazing.  It did not explain how modified grazing would lead to achievement of standards in areas that were still failing standards after 8-10 years of complete non-use.  Nor did it provide support to show that, for areas that had improved

---

[9] BLM considered "historic" use to be use that occurred more than two years prior to the monitoring.  There has not been any grazing on the Monument since 2015 so it is unclear where "current" use had occurred.

1   since 2012 under little or no grazing, its "modified" grazing would not reverse that trend

2   and degrade the recovering areas—particularly for areas found incompatible with grazing

3   in the 2012 analysis.

4        100.    BLM also conducted monitoring of saguaro forests on the Monument in

5   2017-2020.  It found that most saguaros were in the oldest age classes, with very few in

6   the youngest age class, and that the proportion of young saguaros was significantly less

7   on plots near livestock waters versus plots far from waters.  The study indicated that

8   livestock grazing has contributed to reduction of saguaro recruitment in areas of heavier

9   livestock use.   In comparison, lands outside the Monument that had similar poor saguaro

10  recruitment experienced a spike in recruitment when cattle were removed.  Yet BLM

11  made no recommendations in the LHE to restrict livestock use within saguaro forests.

12  **G.    2020 Compatibility Analysis**

13       101.    BLM completed a new compatibility analysis based on the information in

14  the LHE and the saguaro monitoring to assess whether livestock grazing is compatible

15  with protecting the biological objects of the Monument.  It used compliance with the

16  rangeland health standards as a proxy for compatibility with all Monument objects related

17  to vegetation communities, wildlife, species diversity, and functioning ecosystems.  BLM

18  did not provide information about specific habitat needs or populations trends of most

19  wildlife species identified in the Monument proclamation, or assess impacts to species

20  beyond the soil and perennial vegetation parameters monitored.  For instance, it did not

21  consider livestock impacts on annual vegetation, which is important to many wildlife

22  species for food and cover, or other effects such as displacement from prime habitat

23  areas, competition for forage, or trampling of burrows or other shelter.

24       102.    Even using data on ecological conditions that were collected after years of

25  little to no grazing, and reliance on an unsupported method for assessing causality, BLM

26  still concluded that grazing likely caused adverse effects to Monument objects in multiple

27  areas.  The compatibility analysis stated that the majority of areas near livestock waters

28  on the Beloat, Big Horn, Conley, and Lower Vekol allotments are failing to achieve

standards due to grazing, and thus "historically authorized" grazing is unlikely to be compatible with protecting many of the Monument's biological objects on those four allotments.

103.    Specifically, according to BLM's analysis grazing on those allotments is not compatible with protecting diversity of plant and animal species, vegetation communities, and wildlife; and grazing on the Beloat, Big Horn, and Conley allotments is not compatible with protecting saguaro cactus forests.  BLM did not identify the specific lands that were incompatible, as it had done in the prior 2012 compatibility determination, instead giving its conclusions for the allotments as a whole.  It did not explain why it changed approaches.

104.    BLM claimed that grazing the Arnold and Hazen allotments is compatible because the Monument portion of those allotments falls almost entirely within probability use class 5 due to distance from reliable water sources.  All water sources on the Hazen allotment are non-functional because that allotment has not been used for more than ten years.  BLM provided no support or explanation to show grazing would be compatible with protecting Monument objects if water sources were fixed and livestock returned to the Hazen allotment.

105.    The compatibility analysis also considered impacts to historic and cultural objects.  BLM has conducted surveys for cultural resources on only 4% of the Monument area north of Highway 8.  These surveys were all conducted for prior projects and most occurred in the 1980's and 1990's.  At least nine of the 41 cultural or historic sites documented in those surveys had impacts from cattle.  BLM did not conduct any new surveys for the 2020 compatibility analysis.

106.    BLM received information from interest groups that identified many other cultural or historic sites on the Monument. Surveys by Archaeology Southwest in 2017-2018 documented 40 additional cultural resource sites not identified by BLM on just 2,088 acres of Monument land north of Highway 8.  BLM did not evaluate whether livestock grazing had caused any impacts to those sites, nor were all the sites evaluated

for whether they should be recommended as eligible for inclusion on the National Register of Historic Places.

107.    Several tribal nations expressed concerns about grazing on the Monument, particularly the Tohono O'odham Nation.  The Monument consists of traditional use lands of that Nation, and contains both prehistoric and historic sites important to it. The Tohono O'odham Nation discussed the proposed action with BLM at a June 2020 meeting and stated that grazing is not appropriate on the Monument, cultural sites are fragile and easily damaged, and BLM should eliminate grazing.

108.    Cattle have also adversely affected four historic trails on the Monument: the Juan Batista de Anza National Historic Trail, Mormon Battalion Trail, Butterfield Overland Stage Route, and the Komatke Trail important to the Gila River Tribe.  BLM admitted that if livestock grazing is available on the Monument, it will likely cause a moderate level of impact to these historic trails.

109.    After concluding that "previously authorized" grazing on four allotments was incompatible with protecting biological and cultural objects on the Monument, BLM asserted that grazing can remain available across all Monument lands north of Highway 8 if management is altered, with the level of grazing ranging from ephemeral use to 4,232 AUMs of perennial use.  It stated that deferment of grazing on the Hazen and Big Horn allotments has resulted in achievement of rangelands standards so grazing could be allowed if managed conservatively.  The Hazen and Big Horn allotments had not been authorized for any grazing for ten years, and some areas on the Big Horn allotment still did not achieve standards due to livestock impacts.  The Conley allotment has only been grazed once since 2012, and more than 30,000 acres on that allotment are still failing standards.

110.    Rather than identify the specific grazing level and scheme that would be compatible with protecting all Monument objects, BLM pushed off that decision to future "implementation-level" analyses.

**H.     2020 EA/FONSI and Decision Record**

111.    BLM completed an environmental assessment ("EA") for the livestock grazing RMP amendment, which relied on the LHE and compatibility analysis to analyze impacts of its proposed action.  The agency issued an initial Notice of Intent to prepare an EA on March 26, 2020 and received more than sixty comment letters or emails during the 30-day comment period—none of which supported grazing on the Monument.  Just eleven days after that comment period ended, BLM issued its draft EA on May 8, 2020 and held another 30-day comment period.   It received almost nine thousand comments on the draft EA, only a handful of which supported grazing.  Then, 32 days after the draft EA comment period closed, BLM issued its final EA on July 9, 2020.

112.    BLM considered four alternative actions in the EA:  (1) a "no action" alternative that would continue to implement the decision from the 2012 RMP, (2) the proposed action that made all allotments available for grazing at a level up to 4,232 AUMs of perennial use, (3) a no grazing alternative, and (4) an alternative that would close parts of the Big Horn and Conley allotments important for recreation use and cultural sites, with up to 3,293 AUMs of perennial use across the remainder of the area.

113.    BLM eliminated from detailed analysis an alternative that would close all lands that did not meet rangeland health standards due to livestock grazing, claiming it was impractical to implement.  Such an alternative matched the 2012 compatibility determination that all lands not meeting standards due to livestock were off-limits to future grazing.

114.    BLM asserted that the proposed action would result in less grazing than the "historical" level of 8,703 AUMs authorized under the 1985 land use plan.  It did not disclose the last time that level of grazing occurred.  According to BLM, the 4,232 AUMs allowed under the proposed action is the average perennial use from the period 2007-2018.  Very little perennial grazing occurred on the Monument after 2010, and no grazing has occurred since 2015.  Therefore, the average use on the Monument since 2010 is much lower than 4,232 AUMs.  The EA did not acknowledge that the proposed action

would allow BLM to substantially increase grazing on the Monument compared to what had been authorized the last ten years.

115.    In explaining the "modifications" to grazing that were needed for lands still failing standards, BLM stated that areas near water sources would improve because access to those waters would be restricted through fencing and cattle would be redistributed by installing new water sources in less sensitive areas.  The EA did not describe how restricting access to water sources would help when cattle would still congregate outside the fencing to be in close proximity to water.  Nor did it discuss where it might install new water sources, why those areas would be "less sensitive" than areas around current water sources, or the likelihood that heavy use around new water sources would degrade those areas.  The only support BLM provided for its "modifications" was a paper that relied on studies inapplicable to the Sonoran Desert, as numerous comments on the EA pointed out.

116.    In addition to these omissions concerning details of the proposed action, the EA also did not fully or accurately analyze impacts of the alternative actions on numerous resources.  Like the LHE and compatibility analysis, it failed to identify habitat needs of many wildlife species identified in the Monument proclamation and discuss in detail potential effects to them from livestock.  As noted above, many species rely on annual plants for forage and cover but BLM did not address the extent of impacts to these plants from the alternative actions.  BLM has never collected data on utilization of annual vegetation or the abundance and composition of annual plants, and did not propose to collect that information as part of its proposed action.

117.    The lack of analysis about livestock impacts to annual plants is particularly problematic for Sonoran desert tortoise, which rely heavily on annual plants.  BLM simply cited to a 2015 guidance document on the tortoise to claim that livestock grazing generally does not adversely affect the species without actually evaluating in the compatibility analysis or EA where cattle grazing overlaps with the species' habitat on the Monument and whether that grazing impairs the tortoise by reducing annual plants

and/or trampling tortoise burrows.

118.    The EA also did not discuss in detail other effects to wildlife, such as displacement from prime habitat, competition for forage, or trampling of habitat in areas where livestock and other species overlap.

119.    With regard to cultural and historic sites, BLM recognized it had surveyed very little of the analysis area, and that grazing had caused impacts to multiple sites in those limited areas, but it failed to conduct additional surveys to adequately assess past and potential impacts to these resources despite having four years between the court's Order and the new EA.  BLM also acknowledged opposition of several Native American tribes to the proposed action, particularly the Tohono O'odham Nation whose ancestral lands included the Monument, but it did nothing to address those concerns.  BLM offered no measures to protect cultural and historic sites other than somehow restricting grazing if sites were found at new water sources.

120.    The EA stated that grazing has low potential to affect the naturalness and outstanding opportunities for solitude and primitive, unconfined recreation in the North and South Maricopa Wilderness areas because grazing impacts would be "negligible" due to the large size of the wilderness areas and the lack of water developments.  The EA failed to reveal that past utilization monitoring from 2009 showed use near or even exceeding the 20% utilization limit at several monitoring sites that fell within wilderness on the Big Horn and Conley allotments, indicating more than "negligible" impacts in those areas.

121.    Finally, in the EA's discussion of cumulative impacts, it did not analyze how the proposed grazing, *combined with* impacts of drought and climate change, wildfire, renewable energy projects, and recreation use, would affect the Monument's biological and cultural objects.

122.    BLM asserted it did not need to complete a detailed analysis of many of these impacts because it would do so in subsequent implementation-level decisions.  It failed to thoroughly evaluate these resource effects at a larger scale to determine whether

their combined impact warranted a determination that the entire Monument, or areas that extended beyond a single allotment, should be closed to grazing.

123.   Accompanying the Final EA was a "Finding of No Significant Impact" ("FONSI") that concluded BLM did not need to complete an EIS for the new livestock grazing RMP amendment.   BLM made this conclusion despite completing an EIS for another RMP amendment issued in 2018 that concerned recreational target shooting on the Monument.

124.   The FONSI stated that impacts of grazing will be mitigated to reduce them to a non-significant level through fencing water sources and redistributing cattle to new areas that are less sensitive, adjusting AUMs, and adjusting season of use.  BLM still did not explain how fencing water sources would reduce impacts when cattle will simply congregate outside the fences to remain close to the water, why redistributing cattle to new areas and creating greater impacts in those areas would be an insignificant effect, or why areas around current water sources are more "sensitive" than areas around locations of new water sources—locations which BLM has not even identified.  The FONSI also did not explain how adjusting AUMs would reduce impacts to a non-significant level when very little grazing has occurred since 2012 and thus almost any level of grazing would *increase* impacts.

125.   The FONSI listed the NEPA "intensity factors" that would trigger the need for an EIS, including unique characteristics of the area, scientific controversy over the effects of the action, highly uncertain or unknown risks, precedential effect of the action, cumulative impacts with other actions, effects to cultural or historical sites, and effects to threatened or endangered species.  The FONSI dismissed each of these factors with little explanation, and the record does not support BLM's conclusions.

126.   A number of protests to the EA and FONSI were submitted to BLM but only two were deemed valid—including the protest by WWP and Sierra Club.  These groups raised numerous points in their protest, including that the LHE and compatibility analysis were flawed in many ways, and that BLM failed to adequately assess impacts of

1  grazing on all resources and Monument objects, failed to use high quality data and

2  accurate analysis, failed to disclose all relevant data and analysis to the public, failed to

3  consider all reasonable alternative actions, and should have prepared an EIS.

4  127.  BLM responded to the WWP/Sierra Club protest by arguing it did not need

5  to do a detailed site-specific analysis to determine all lands on the Monument are

6  available for grazing.  Such analysis would come later at the implementation stage.  It

7  claimed it adequately considered all relevant impacts and all reasonable alternatives, and

8  that the proposed grazing did not meet the criteria for significance to warrant an EIS.

9  128.  During the NEPA process, BLM also consulted with the State Historic

10  Preservation Office ("SHPO") pursuant to the National Historic Preservation Act

11  (NHPA).  Despite its limited cultural resource surveys, a scathing comment letter from

12  Archaeology Southwest on June 5, 2020 discussing adverse effects to cultural and

13  historic sites on the Monument, and significant concerns expressed by the Tohono

14  O'odham Nation at the June 10, 2020 meeting, BLM signed a "no adverse effects"

15  determination under the NHPA on June 12, 2020 and sent it to SHPO.  SHPO reviewed

16  BLM's determination a couple weeks later and sent a concurrence letter the next working

17  day.  BLM did not take further actions to consult with the Tohono O'odham Nation or

18  other interested parties such as Archaeology Southwest, or otherwise address their

19  concerns.

20  129.  On September 28, 2020, BLM signed the Decision Record for the RMP

21  amendment.  It adopted the proposed action—keeping the entire area north of Highway 8

22  available to grazing—as the final decision.

### FIRST CLAIM FOR RELIEF
**VIOLATION OF FEDERAL LAND POLICY AND MANAGEMENT ACT AND NATIONAL LANDSCAPE CONSERVATION SYSTEM ACT**

25  130.  Plaintiffs reallege and incorporate by reference the preceding paragraphs.

26  131.  This first claim for relief challenges BLM's violation of the Federal Land

27  Policy and Management Act and National Landscape Conservation System Act in

28  adopting the Decision Record for the Sonoran Desert National Monument Livestock

Grazing Resource Management Plan Amendment.

132.   FLPMA states that BLM must manage its lands under principles of multiple use and sustained yield . . . "except that where a tract of such public land has been dedicated to specific uses according to any other provision of law it shall be managed in accordance with such law." 43 U.S.C. § 1732(a).  The NLCS Act directs BLM to manage National Monument lands "in a manner that protects the values for which the [Monument] [was] designated."  16 U.S.C. § 7202(c)(2).  Therefore, BLM must manage the Sonoran Desert National Monument in accordance with the Presidential proclamation that established the Monument and set forth the objects to be protected.  Proclamation No. 7397, 66 Fed. Reg. 7354 (Jan. 22, 2001).

133.   As discussed above, the proclamation identified numerous vegetation communities on the Monument, including creosote-bursage, paloverde-mixed cacti, and saguaro forest communities.  It noted the wide diversity of wildlife on the Monument, such as birds, mammals, and reptiles, including Sonoran desert tortoise.  It also called out the prevalence of historic and cultural sites found on the Monument.  In order to protect these values, the proclamation directed that livestock grazing on the Monument must end on lands south of Highway 8, and could continue on lands north of Highway 8 only if BLM determined that grazing is compatible with the paramount purpose of protecting the objects identified in the proclamation.  BLM was required to prepare a management plan that addresses the actions necessary to protect the objects identified in the proclamation.

134.   BLM did not comply with the Monument proclamation, and thereby violated FLPMA and the NLCS Act, in several ways:

A.   BLM's Monument management plan failed to include actions necessary to protect objects identified in the proclamation because the RMP amendment did not identify any lands as unavailable for grazing;

B.   The RMP Amendment relied on a compatibility analysis that did not adequately assess impacts of grazing on all Monument objects to be

protected;

C.     The RMP Amendment allowed continued grazing on all lands north
       of Highway 8 despite significant evidence that grazing would
       adversely affect Monument objects on some of those lands,
       including the creosote-bursage and desert wash vegetation
       communities, saguaro forests, diversity of plant and animal species,
       functioning desert ecosystem, and cultural and historic sites.

135.   For these reasons, BLM's compatibility analysis and Decision Record for
the livestock grazing RMP amendment are arbitrary, capricious, an abuse of discretion
and contrary to Proclamation No. 7397, FLPMA and the NLCS Act. Under 5 U.S.C. §
706(2)(A), the court must hold unlawful and set aside the compatibility analysis and the
Decision Record for the Sonoran Desert National Monument Livestock Grazing RMP
Amendment.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT
### Failure to Prepare an EIS

136.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

137.   This second claim for relief challenges BLM's decision to issue a FONSI
rather than prepare a full Environmental Impact Statement in connection with its
livestock grazing amendment to the Sonoran Desert National Monument Resource
Management Plan, in violation of NEPA.

138.   NEPA requires an agency to prepare a full EIS when it proposes to take an
action that "significantly affect[s] the quality of the human environment."  42 U.S.C. §
4332.  If an agency determines that a proposed action will not "significantly affect the
quality of the human environment," it may issue an EA and FONSI rather than a full EIS.
An agency should prepare an EIS whenever there are "substantial questions . . . as to
whether the [proposed action] *may* cause significant degradation of some human
environmental factor."  *WildEarth Guardians v. Provencio*, 918 F.3d 620, 633 (9th Cir.
2019) (citation and quotation omitted and emphasis added).

139.   BLM's failure to prepare an EIS, and instead issue a FONSI, for its livestock grazing amendment to the Monument RMP was arbitrary and capricious and violates NEPA.

140.   BLM's decision to allow grazing on all lands north of Highway 8 may have significant environmental effects, particularly on lands that BLM previously determined were not compatible with livestock grazing and were closed to grazing under the 2012 RMP.  BLM must prepare an EIS to assess the potentially significant effects of making *all* lands north of Highway 8 available for livestock grazing.

141.   BLM's FONSI unreasonably dismissed several of the NEPA intensity factors that demonstrate the need for an EIS, including but not limited to the following:

    A.   Scientific controversy over the effects of the proposed grazing, including controversy over the new LHE and compatibility analysis methods and conclusions;

    B.   Unique characteristics of the area, including significant historic and cultural sites, important habitat for Sonoran desert tortoise and saguaro cacti, two wilderness areas, and its status as a National Monument within the National Conservation Lands System;

    C.   Adverse effects to important cultural and historic sites;

    D.   Adverse effects to habitat for ESA listed or candidate species, including Sonoran desert tortoise;

    E.   The precedent this decision will set for future livestock grazing on this and other National Monuments;

    F.   Cumulative impacts with other actions, such as wildfire, climate change, and recreation use, that may create significant effects when combined with the proposed action; and

    G.   Violation of FLPMA, the NLCS Act, and the Monument proclamation.

40 C.F.R. § 1508.27(b)(3), (4), (6), (7), (8), (9), (10).

142.    The FONSI was also unreasonable by relying on mitigation measures—fencing water sources, redistributing cows by building more water sources, reducing AUMs from historic levels, adjusting season of use—without providing adequate explanation and factual support to show those measures would reduce any grazing impacts to an insignificant level.

143.    The record shows there is at least a substantial question as to whether the proposed action *may* cause significant degradation of some environmental factor, thus triggering BLM's obligation to prepare an EIS.  Accordingly, BLM's decision to issue a FONSI rather than prepare an EIS was arbitrary, capricious, an abuse of discretion, and contrary to NEPA.  Under 5 U.S.C. § 706(2)(A), the court must hold unlawful and set aside the FONSI, as well as the Decision Record that relied on the FONSI, for the Sonoran Desert National Monument Livestock Grazing RMP Amendment.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT
### Failure to Consider an Adequate Range of Alternatives

144.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

145.    This third claim for relief challenges BLM's choice rejecting additional reasonable alternative actions from full analysis in the Final EA.

146.    NEPA requires an agency to fully assess all reasonable alternative actions in its environmental analysis.  42 U.S.C. § 4332(E); *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 601-02 (9th Cir. 2010).

147.    BLM violated NEPA by failing to assess a reasonable range of alternative actions in the EA.  In particular, BLM dismissed without reasonable explanation an alternative action to make all lands that did not meet land health standards due to livestock grazing unavailable for future grazing.  BLM's reasons for failing to consider this alternative in detail were irrational given it had followed this very course of action in its 2012 compatibility determination.

148.    Because BLM failed to consider all reasonable alternative actions, the EA is arbitrary, capricious, an abuse of discretion, and contrary to NEPA.  Under 5 U.S.C. §

706(2)(A), the court must hold unlawful and set aside the Final EA, as well as the Decision Record that relied on the EA, for the Sonoran Desert National Monument Livestock Grazing RMP Amendment.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT
### Failure to Take a "Hard Look" at the Effects of the Action

149.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

150.    This fourth claim for relief challenges BLM's Final EA for failing to take a "hard look" at the environmental consequences of its livestock grazing RMP amendment for the Sonoran Desert National Monument, in violation of NEPA.

151.    NEPA requires that federal agencies "take a hard look at the environmental consequences of their actions" in order to "foster[] both informed decision-making and informed public participation." *San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*, 817 F.3d 653, 659 (9th Cir. 2016).  In taking a hard look at the environmental consequences of making all lands on the Monument north of Highway 8 available to livestock grazing, BLM was required to consider all direct, indirect, and cumulative effects of the proposed action, including "effects on natural resources and on the components, structure, and functioning of affected ecosystems;" aesthetic effects; economic effects; and effects on historical or cultural resources.  40 C.F.R. § 1508.8(b).

152.    NEPA also required BLM to ensure the accuracy and scientific integrity of its analysis—that is, to use "high quality information" and "accurate scientific analysis" in assessing the probable environmental effects of grazing on the Monument.  40 C.F.R. § 1500.1(b); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016). If BLM presented "information so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives," then its analysis violated NEPA. *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018).

153.    BLM failed to take a hard look at the effects of allowing grazing across all lands on the Monument north of Highway 8.  First, BLM relied on the flawed LHE and compatibility analysis as the basis of its EA and Decision Record.  The LHE and

compatibility analysis did not contain high quality, accurate information but, rather, relied on unverified and unreasonable methods that produced unsupported and irrational conclusions.  The LHE and compatibility analysis were arbitrary and capricious for numerous reasons, including: (1) ignoring past monitoring data and studies from when grazing actually occurred on the Monument and instead relying solely on one year of data collected after years of non-use to assess impacts of grazing; (2) using unsupported and unreasonable plant community desired condition objectives; (3) failing to analyze impacts of grazing on annual plants; (4) failing to verify its use probability mapping; (5) failing to adequately assess impacts to all Monument objects; (6) assessing compatibility of grazing only at the allotment scale; (7) relying on mitigation measures that are unsupported and irrational for reducing impacts of grazing; and (8) failing to provide rational explanations and conclusions about compatibility of grazing that are supported by the record.

154.    BLM thus violated NEPA by issuing the Final EA without adequately, honestly, and clearly explaining the assumptions and analysis used in the LHE and livestock grazing compatibility analysis, and without having a reasonable basis in science or fact for its conclusions in the LHE and compatibility analysis.

155.    Second, BLM failed to take a hard look at all direct, indirect, and cumulative effects of its proposed action because neither the LHE/compatibility analysis or the EA adequately disclosed and analyzed the following:

        A.    Effects on vegetation and soil resources, including plant communities, annual vegetation, saguaro forests, and soil crusts;

        B.    Effects on multiple wildlife species, especially Sonoran desert tortoise;

        C.    Effects on cultural and historic objects;

        D.    Effects on wilderness;

        E.    Cumulative effects of the grazing combined with effects of drought/climate change, recreation use, and wildfires on and around

the Monument.

156.    By failing to take a "hard look" at the environmental consequences of the livestock grazing RMP amendment, BLM issued a Final EA that was arbitrary, capricious, an abuse of discretion, and contrary to NEPA.  Under 5 U.S.C. § 706(2)(A), the court must hold unlawful and set aside the Final EA, as well as the Decision Record that relied on the EA, for the Sonoran Desert National Monument Livestock Grazing RMP Amendment.

### FIFTH CLAIM FOR RELIEF
### VIOLATIONS OF THE NATIONAL HISTORIC PRESERVATION ACT

157.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

158.    This fifth claim for relief challenges BLM's violations of the National Historic Preservation Act in adopting the Decision Record for the Sonoran Desert National Monument Livestock Grazing RMP Amendment.

159.    Section 106 of the NHPA seeks to protect America's heritage by requiring federal agencies to take into account the effects of their "undertakings" on "historic properties."  *See* 54 U.S.C. § 306108; 36 C.F.R. pt. 800.   An "undertaking" includes any activity requiring a Federal permit, license or approval, and a "historic property" is any "prehistoric or historic district, site, building, structure, or object included on, or determined eligible for inclusion on, the National Register [of Historic Places]."  36 C.F.R. §§ 800.16(y), 800.16(l)(1); 54 U.S.C. § 300308.  During the Section 106 process, an agency must consult with the State Historic Preservation Office (SHPO), Native American tribes, and other interested parties.

160.    Under Section 106, an agency must make a "reasonable and good faith effort" to identify historic and cultural properties that could be affected by the activity, and then evaluate the National Register eligibility of all identified sites. 36 C.F.R. §§ 800.4(b)(1), 800.4(c).  Sites that were previously evaluated may need to be reevaluated due to the "passage of time, changing perceptions of significance, or incomplete prior evaluations." *Id.* § 800.4(c)(1).

161.    If the agency finds that eligible properties are present, it must assess

whether the proposed undertaking may cause adverse effects on the identified historic properties, in coordination with consulting parties. *Id.* §§ 800.4(d), 800.5. An adverse effect is found when an undertaking *may* directly or indirectly alter "any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1).

162.    The process concludes with an agency determination of "adverse effect" or "no adverse effect." *Id.* § 800.5(d)(1). If the agency reaches a "no adverse effect" finding, it must provide notice and documentation of such finding to all consulting parties. *Id.* § 800.5(c). Consulting parties may object to such a finding, which elevates the consultation to the Advisory Council on Historic Preservation. *Id.* § 800.5(c)(2). This process must be completed prior to the agency making its decision. 54 U.S.C. § 306108.

163.    If the agency reaches an "adverse effect" finding, it must notify all consulting parties and invite their views to assess adverse effects. *Id.* § 800.6. The agency must work with consulting parties to develop measures to avoid, minimize, or mitigate any adverse effects. *Id.*

164.    Agency officials must "ensure that a determination, finding, or agreement under the procedures in this subpart is supported by sufficient documentation to enable any reviewing parties to understand its basis." *Id.* § 800.11(a).

165.    BLM's Section 106 process for the livestock grazing RMP amendment violated the NHPA in the following ways, each of which is a distinct and separate violation of law:

        A.    BLM failed to make a reasonable and good faith effort to identify historic properties on the Monument north of Highway 8;

        B.    BLM failed to adequately conduct eligibility determinations for all historic properties identified by it or other parties on the Monument north of Highway 8;

C.      BLM's No Adverse Effect determination was unsupported, unreasonable, and contrary to evidence showing livestock impacts to cultural and historic sites on the Monument;

D.      BLM failed to follow proper procedures for consulting with tribes and other interested parties during the Section 106 process.

166.    For these reasons, BLM's Decision Record for the livestock grazing RMP amendment is arbitrary, capricious, an abuse of discretion and contrary to the NHPA. Under 5 U.S.C. § 706(2)(A), the court must hold unlawful and set aside the Decision Record for the Sonoran Desert National Monument Livestock Grazing RMP Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

A.      Order, adjudge, and declare that BLM violated FLPMA, the NLCS Act and the APA in approving the 2020 Sonoran Desert National Monument Livestock Grazing RMP Amendment.

B.      Order, adjudge, and declare that BLM violated NEPA and the APA in approving the 2020 Sonoran Desert National Monument Livestock Grazing Final EA/FONSI and RMP Amendment.

C.      Order, adjudge, and declare that BLM violated NHPA and the APA in approving the 2020 Sonoran Desert National Monument Livestock Grazing Final EA/FONSI and RMP Amendment.

D.      Remand, set aside, and vacate the 2020 Sonoran Desert National Monument Livestock Grazing RMP Amendment and Final EA.

C.      Grant such further injunctive relief as requested hereafter by Plaintiffs.

D.      Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq. and/or all other applicable authorities; and

E.      Grant such further relief as the Court deems just and proper in order to

1    provide Plaintiffs with relief and protect the public interest.

2

3                                    Dated: June 29, 2020

4

5                                        /s/Lauren M. Rule
                                         Lauren M. Rule (OSB # 015174)
6                                        ADVOCATES FOR THE WEST
                                         3701 SE Milwaukie Ave., Suite B
7                                        Portland, OR 97202
                                         (503) 914-6388
8                                        lrule@advocateswest.org

9
                                         /s/ Cynthia C. Tuell
10                                       Cynthia C. Tuell (AZSB # 025301)
                                         738 N. 5th Ave, Suite 206
11                                       Tucson, AZ 85705
                                         (520) 272-2454
12                                       cyndi@westernwatersheds.org
                                         Attorneys for Plaintiffs
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28